UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BESS BAIR, et al.,

    Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF TRANSPORTATION, et al.,

    Defendants.

No. C 17–06419 WHA

**ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFFS**

## INTRODUCTION

After losing an appeal, plaintiffs renew undecided environmental claims against the California Department of Transportation and its director for the approval of a road-widening project that may impact redwood trees along Highway 101. To the extent stated herein, defendants' motion for summary judgment is **GRANTED**.

## STATEMENT OF FACTS

In this decade-long action, this is the third round aimed at blocking a California Department of Transportation ("Caltrans") project to widen a portion of Highway 101 winding through the old-growth redwood trees in Richardson Grove State Park, located just south of Humboldt County.

Extra-long trucks used elsewhere in California and the United States are now prohibited (with some exceptions) on this tightly-curved and narrow stretch of highway, closely abutted by the old-growth redwoods. Though eighteen-wheelers already use Highway 101 and pass through Richardson Grove, the project seeks to widen the road to accommodate even longer trucks authorized by the Surface Transportation Assistance Act of 1982, 96 Stat. 2097 ("STAA"), 23 U.S.C. § 101 et seq. "STAA heavies" are longer and often contain more volume than the standard eighteen-wheelers. As a result of travel restrictions, STAA heavies must detour around Richardson Grove State Park to reach Humboldt County. This forces them to detour as many as 400 miles, up to Oregon and back again, in order to avoid Richardson Grove.

The current project to improve Highway 101 started in 2006 and in 2007 Caltrans assumed responsibility to ensure the project complies with environmental regulations. The project seeks to widen the Richardson Grove section of Highway 101 to safely accommodate STAA heavies passing each other in opposite directions. No environmental impact statement has ever been done for the project, though the project has been revised three times during its long course of development.

This case centers around the sufficiency of Caltrans' environmental assessments (EAs) of the project and Caltrans' obligation to prepare a more thorough environmental impact statement (EIS) in order to determine effect of the proposed project to improve Highway 101. If an EA shows the project may significantly affect the environment, a more in-depth EIS must be prepared. Otherwise, the agency can declare a "finding of no significant impact" and skip the EIS. 40 C.F.R. §§ 1501.3, 1501.4.

In 2008, after issuing a draft EA — pursuant to the National Environmental Policy Act ("NEPA") and Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303 ("Section 4(f)") — Caltrans opened its draft EA to public comment and received nearly 800 letters and emails, both in support of and in opposition to the project. Caltrans changed its proposal in response, and in 2010, approved a final EA, and adopted a Finding of No Significant Impact ("FONSI"). The project entailed curve realignments, drainage

improvements, shoulder widening, cuts and fills, and a retaining wall. No old-growth redwoods needed removing. A controversy arose nevertheless over concerns that excavation activities would impact the health of old-growth redwoods. *See Bair v. California State Dept. Of Transp.*, 867 F. Supp. 2d 1058, 1062–63 (N.D. Cal. 2012) (*Bair I*).

In 2010, some of the plaintiffs in this action filed suit. In 2011, a preliminary injunction halted all activity on the project while the parties litigated the merits. An April 2012 order in *Bair I* granted partial summary judgment against defendants, finding flaws in Caltrans' assessment of the environmental impact of the project. After inspecting the inaccuracies further, the resulting order required Caltrans to modify its assessment in light of the corrections or to conduct an EIS. The order encouraged Caltrans to "give serious consideration to the other significant arguments made by plaintiffs in their motion" and also "to prepare accurate maps signed by a qualified engineer." *Id*. at 1063–67.

Caltrans did not appeal the order. Instead, Caltrans developed a "Supplement to the Final Environmental Assessment." In September 2013, Caltrans once again invited public comment, which drew over 9000 responses. After taking the comments into account, the 2013 Supplement reported several changes to the project from *Bair I*, including the addition of barrier transitions and crash cushions and the removal of two additional trees as compared to the 2010 EA. In January 2014, a reevaluation of the 2010 FONSI was approved based on the combined 2010 EA and 2013 Supplement (2017 AR 457–60).

Unsatisfied with the revisions, some plaintiffs from *Bair I* filed a second action in 2014 (*See Bair v. California State Dept. Of Transp.*, No. 3:14-cv-03422-WHA) (*Bair II*). Before the second action went very far, however, Caltrans reversed course and published a "Notice of Rescission of Finding of No Significant Impact" based on a writ of mandate (from a parallel California Environmental Quality Act litigation) by the Humboldt County Superior Court which directed Caltrans to perform additional environmental analysis. See *Lotus v. Dep't of Transp.*, 223 Cal. App. 4th 645 (2014). Specifically, the rescission required that the "new NEPA findings and any other necessary Federal environmental determinations will be issued

3

consistent with this additional analysis" (32 AR 467). The parties dismissed *Bair II* by stipulation (*Bair v. California State Dept. Of Transp.*, No. 3:14-cv-03422-WHA, Dkt. No. 36).

In light of *Lotus*, Caltrans conducted an additional old-growth tree report in 2015. In May 2017, Caltrans approved a revised Environmental Assessment together with a new FONSI, the determination now at issue. The 2017 EA/FONSI incorporated by reference the 2010 EA and 2013 Supplement and indicated portions of the analysis that differed from prior versions of the proposal.

The 2017 EA/FONSI increased by seven the number of old-growth redwood trees that would be subject to work within their structural root zone. On the other hand, the 2017 EA/FONSI reduced the area of disturbed soil, reduced the volume of excavated material, reduced the estimated volume of fill, and reduced the total number of non-old-growth trees to be removed (from 54 to 38). The revisions ensured that no old-growth redwoods would be removed. No new round of public comment was invited, but Caltrans took steps to circulate the notice of the May 2017 EA/FONSI (using State Clearinghouse, Facebook, publishing it in the Federal Register, etc.).

In November 2017, plaintiffs (individual supporters and non-profit environmental groups) filed this action to challenge the 2017 EA/FONSI, alleging that Caltrans violated NEPA, the Department of Transportation Act, and the Wild and Scenic Rivers Act (*Bair v. California Dep't of Transp.*, 3:17-cv-06419-WHA, Dkt. 1).

The administrative record in this case amounts to an ever-growing mountain of documents. The record now before us has ballooned to 57 volumes amounting to just under 18,000 pages combined from the various iterations of findings and assessments throughout the process of attempting to greenlight this project. Iterations of the report have created challenges to tracking changes across revisions to these EAs and the remaining operative sections. This order will not detail all the confusions and clarifications up to this point; the May 2019 order on summary judgment lays out this tortured history in more detail (Dkt 107 at 6–7).

Turning to the procedural posture of this action, in September and October 2018, the parties filed cross-motions for summary judgment. After a November 2018 hearing the

4

undersigned judge requested supplemental briefing, including a declaration from the Superintendent of California Department of Parks and Recreation ("State Parks"), Victor Bjelajac (Dkts. 63, 151). A May 2019 order granted summary judgment for plaintiffs (Dkt. 107). A June 2019 order required Caltrans to conduct an EIS based on a fresh, understandable administrative record and enjoined the project from breaking ground until the finalization of the EIS (Dkt. 117). In July 2019, Caltrans appealed. In December 2020, our court of appeals issued an order reversing the grant of summary judgment and holding that "Caltrans' environmental analyses regarding the redwoods and traffic satisfied NEPA's requirements" (Dkt. 137 at 21). Plaintiffs' request for a rehearing en banc was denied (Dkt. 139). The parties submitted renewed cross motions for summary judgment based on the order from our court of appeals. We now turn to resolving the remaining claims post-remand.

**ANALYSIS**

A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiff's complaint has asserted claims under NEPA, the Department of Transportation Act of 1966, and the Wild and Scenic Rivers Act.

**1.   THE NINTH CIRCUIT'S ORDER FORECLOSED PLAINTIFFS' NEPA CLAIM**

"A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012). Though our court of appeals' order specifically addressed the four factors found in this Court's prior order granting summary judgment for the plaintiffs, the opinion forecloses plaintiffs' remaining NEPA claims. Even "when a court is confronted with issues that the remanding court never considered, the mandate requires respect for what the higher court decided, not for what it did *not* decide." *Ibid*. (emphasis in original, quotations and citations omitted). The appeal order broadly stated that court of appeals felt "satisfied that Caltrans took a hard look at the consequences of the Project, and adequately considered the relevant factors" and that "Caltrans' issuance of the 2017 FONSI was reasonable" (Dkt 137 at 15, 22). The undersigned judge therefore lacks authority to reassess

5

the NEPA claims, as the unequivocal language of the remand opinion forecloses such consideration.

### 2. PLAINTIFFS FAIL TO ESTABLISH THAT CALTRANS VIOLATED SECTION 4(f)

In 1966, in an effort to protect parks and historic sites of public importance, Congress enacted the U.S. Department of Transportation Act, declaring that:

> (4)(f) The Secretary shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of this Act, the Secretary shall not approve any program or project which requires the use of any land from a public park, recreation area, wildlife and waterfowl refuge, or historic site unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

Department of Transportation Act of 1966, Pub. L. No. 89-670 (1966). This pronouncement was codified in U.S. Code, Title 49, Section 303 with much the same language, but added the procedure for the approval of projects impacting public parks (among other protected sites) as follows:

> (c) **Approval of programs and projects.** — Subject to subsections (d) and (h), the Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 2041 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if —
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

Analysis of the use of Section 4(f) property must "include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property." 23 C.F.R. §

774.7.  Section 4(f) also requires that an analysis of alternatives consider, among other factors, "[t]he views of the official(s) with jurisdiction over each Section 4(f) property."  23 C.F.R. § 774.3(c)(iv).

In the process of approving a project, agencies may use a "programmatic" Section 4(f) evaluation, a time-saving procedural alternative to preparing an "individual" Section 4(f) evaluation when certain criteria are met.  23 C.F.R. § 774.3(d)(1).  While "individual" Section 4(f) evaluations require more attention to the specific circumstances of a project, "programmatic" evaluations allow for a more stream-lined approval process "based on experience with a specific set of conditions" for certain types of projects.  23 C.F.R. § 774.3(d)(1).  Section 774.3(d)(1) specifies that information on Section 4(f) evaluations can be found on the Federal Highway Administration's (" FHWA") website.[1]  FHWA's Section 4(f) instructions explain requirements for approval for distinct project categories (*e.g..*, "Historic Bridges," "Minor Involvements with Historic Sites," etc.).  For projects falling under the "Minor Involvements with Public Parks, Recreation Lands, and Wildlife and Waterfowl Refuges" category (as does the project in our case), FHWA specifies that a Section 4(f) programmatic evaluation may be pursued if the project satisfies seven criteria.[2]

Plaintiffs allege that Caltrans failed to meet Criteria 3, 4, 5, and 7 (20 AR 6309–10):

> 3. The amount and location of the land to be used shall not impair the use of the remaining Section 4(f) land, in whole or in part, for its intended purpose.  This determination is to be made by the FHWA in concurrence with the officials have jurisdiction over the Section 4(f) lands . . . .
>
> 4. The proximity of impacts of the project on the remaining Section 4(f) land shall not impair the use of such land for its intended purpose.  This determination is to be made by the FHWA in concurrence with the officials that have jurisdiction over the Section 4(f) lands . . . .
>
> 5. The officials that have jurisdiction over the Section 4(f) land must agree, in writing, with the assessment of the impact of

---

[1] Section 774.3(d) directs to the FHWA Environmental Review Toolkit, at www.environment.fhwa.dot.gov/4f/4fnationwideevals.asp (Issued 12/23/86).
[2] The full set of criteria for "Minor Involvements with Public Parks, Recreation Lands, and Wildlife and Waterfowl Refuges" can be found at https://www.environment.fhwa.dot.gov/legislation/section4f/4fminorparks.aspx (Issued 12/23/86).

7

> the proposed project on, and the proposed mitigation for, the Section 4(f) lands.
>
> 7. . . . . Should any of the above criteria not be met, this programmatic Section 4(f) evaluation cannot be used, and an individual Section 4(f) evaluation must be prepared.

Our court of appeals has held, that small irregularities or technical deficiencies in a Section 4(f) evaluation may not be used to foreclose approval. In *Adler v. Lewis*, our court of appeals considered the validity of a Section 4(f) evaluation prepared to gain approval for the construction of a corridor for Interstate Highway 90 in Washington state. 675 F.2d 1085, 1095 (9th Cir. 1982). The district court found for the defendants. On appeal *Adler* held:

> [E]ven under the exacting Section 4(f) requirements, the judicial branch may not "fly speck," if it appears, in its review, that all factors and standards were considered. Whether or not the reports and studies use the "magic" terminology, there has been a reasonable and thorough review of a voluminous record accumulated over a span greater than ten years, which includes extensive public contribution.

*Ibid*., see also *HonoluluTraffic.com v. Fed. Transit Admin*., 742 F.3d 1222 (9th Cir. 2014). So too here.

We must keep in mind that this project is not a brand new highway through pristine parkland. It is an improvement to an existing highway already long laid through a parkland. The improvement will be in the form of some widening and straightening.

### A. STATE PARKS CONCURRED AND THE CONCURRENCE REMAINS VALID

Plaintiffs argue that Caltrans never satisfied Criteria 3, 4, and 5 (and therefore 7 as well) because State Parks never concurred with Caltrans' Section 4(f) evaluation. This claim warrants a closer look at the back-and-forth between State Parks and Caltrans.

In late October 2009, Caltrans sent a letter to State Parks, enclosing the programmatic Section 4(f) evaluation for State Parks' review. Caltrans requested a letter of concurrence from State Parks if they agreed with Caltrans' determinations (6 AR 1894):

> If you find the document satisfactory, please respond with a letter stating that you concur with the determinations made:
>
> - That there is no feasible and prudent alternative to the use of land from Richardson Grove State Park property

8

- The proposed action includes all possible planning to minimize harm to Richardson Grove State Park resulting from such use and causes the least overall harm in light of the statute's preservation purpose

State Parks responded in mid-November 2009, stating the following (6 AR 1908):

> Based on the information provided, we accept that your department has concluded there is currently no feasible and prudent alternative to the proposed realignment through Richardson Grove State Park.
>
> We agree that the proposed realignment has included all possible planning by your department to minimize the long[-]term harm to Richardson Grove State Park Resources.

The letter contained no other details or substantive findings.

In 2013, during the public comment period for Caltrans' supplement to the final EA, State Parks submitted concerns over the project, including the accuracy of assessments of work done near trees' root zones, noise disturbance to park visitors, the uncertainty of redwoods' response to cumulative stressors, and the increased risk of vehicle strikes to trees (33 AR 719–22). In closing, the letter requested that Caltrans consider long-term tree monitoring and a retrospective analysis of the impact on the trees.

*First*, plaintiffs dispute whether the bare-bones 2009 letter served as a concurrence. This order agrees that prior to this litigation, there was not a clear-cut concurrence. The 2009 letter does not use the language of FHWA's guidance regarding programmatic evaluations and the separate 2013 letter from State Parks "raised concerns." These inconsistencies, however, have been eclipsed by declarations (one from 2018 and one from 2021) filed in this litigation.

State Parks Superintendent, Victor Bjelajac, provides declarations (under oath) that do recite every concurrence called for by the guidance. Superintendent Bjelajac, the staff member who would sign concurrence letters, also provides sworn testimony that State Parks' prior concurrence has not changed in light of newly-available information (Dkts. 63-1, 151-2). The new batch of information included the 2015 tree report, the May 2017 FONSI, and the May 2017 Addendum. Superintendent Bjelajac also provided context around the process of forming a letter of *non*-concurrence (Dkt. 63-1, ¶ 7):

9

> In instances where State Parks agrees that a project meets some of the programmatic criteria but not others, State Parks will describe the criteria that have not been met in a letter of nonconcurrence.

This order finds that our record supports the conclusion that State Parks fully concurs in the proposal in its most recent incarnation. It is true that these sworn statements have been prepared by the concurring agency after the fact but there is little point in remanding on this limited issue since it is clear that State Parks would repeat the same concurrence on remand.

Our situation is different from a situation where an agency making the decision itself changes its rationale on judicial review of agency action. The declaration arguably falls into an exception to the general rule that a district court should not consider evidence extrinsic to the administrative record upon which the agency relied. Our court of appeals explained:

> We allow expansion of the administrative record in four narrowly construed circumstances: (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) (citing *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)). Though exception (2), (3), and (4) do not apply in our case, exception (1) does. Here, we need to supplement our record with Superintendent Bjelajac's declaration to confirm that Caltrans received the required "agreement, in writing" that would permit the less demanding programmatic Section 4(f) evaluation. 23 C.F.R. § 774.3(d)(1). Without Bjelajac's declaration clarifying the 2009 letter, there would be unresolved ambiguity. We could not determine whether or not Caltrans' "considered all factors" or "explained its decision" reasonably based on the 2009 letter from State Parks.

True, an agency cannot prop up a prior decision with "post-hoc rationalizations." *Ibid*. Clarification of the letter, however, does not rank as a post hoc justification or a "new rationalization . . . for sustaining . . . [the] agency's decision," because Caltrans relied on the

United States District Court
Northern District of California

presumed concurrence by State Parks' all along. *Ibid*. (citing *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

That State Parks and Caltrans consistently communicated regarding the project further evidences State Parks' implicit concurrence post-2009. The 2010 EA and Programmatic Section 4(f) Evaluation report explain that Caltrans worked with State Parks to include the revegetation of areas impacted by the project (1 AR 202). The 2010 programmatic evaluation also includes an agreement by Caltrans to transfer an equivalent half-acre parcel in Zierott Walton Family Memorial Grove (part of a right of way easement held by Caltrans) back to State Parks after enhancing the parcel with additional flora (1 AR 202–03).

*Second*, plaintiffs argue that State Parks' comment to the 2013 Supplement indicates nonconcurrence (33 AR 719). If so, that problem has been cured by Superintendent Bjelajac's declarations.

*Third*, plaintiffs dispute that the 2009 concurrence could be applied to the project's later 2017 EA/FONSI. Any remaining doubt about the continued validity of the 2009 letter has, once again, been dispelled by Superintendent Bjelajac who explained that State Parks' "evaluation has not expired and remains valid," even in light of review of more recent documents (Dkt. 63-1, Decl. Bjelajac ¶¶ 8, 9). Superintendent Bjelajac noted "the potential for Project impacts to old growth redwood trees has been reduced due to Project modifications since 2009," further supporting State Parks' concurrence (Dkt. 63-1, Decl. Bjelajac ¶¶ 10, 11, 12). Thus, Superintendent Bjelajac has confirmed that these conclusions remain true through 2021 (Dkt. 151-2, ¶ 4). Caltrans received the necessary concurrence for the programmatic Section 4(f) analysis.

### B. CALTRANS' CONSIDERATION OF ALTERNATIVES WAS ADEQUATE

Caltrans has provided sufficient analysis to rule out other alternatives as infeasible or imprudent as required by Section 4(f) (1 AR 44–52). Throughout the process, including in the 2010 EA, Caltrans considered and eliminated several alternatives to the highway improvement project: signals restricting two-way traffic, time-of-day travel restrictions on STAA heavies, warnings (such as a reduced speed advisory), and combinations of these potential solutions.

11

Caltrans reasonably concluded that none of these options sufficiently met the purpose of the project. Caltrans determined that restricting Highway 101 to alternating one-way traffic could cause backups of one to two miles and could increase the risk of rear-end accidents (1 AR 46–52). The other alternatives did not address the physical characteristics of this portion of highway, which would need to be fixed to prevent trucks from off-tracking into oncoming traffic (1 AR 20–21).

In its Section 4(f) evaluation, Caltrans also found that building a new road to bypass Richardson Grove State Park would cost too much. The considered road construction alternatives ranged in price from an estimated $340 to $600 million (compared to the $5.5 million proposed Richardson Grove project) (1 AR 206).

Plaintiffs suggest that Caltrans' assessment unreasonably failed to consider the possibility of STAA access to Humboldt via State Route 299. However, this access did not become available until November 2017, months after the release of the May 2017 EA/FONSI. Even if Caltrans knew SR 299 access would be a future possibility when approving the EA/FONSI back in May 2017, requiring STAA trucks to use State Route 299 would still result in a 93-mile detour required for trucks travelling north, *e.g.* from San Francisco to Eureka (51 AR 6464; Dkt. 152-1, Gross Decl., Exh. A; Dkt. 153-2 at 2). This alternate route, like other considered alternatives, also failed to address structural deficiencies of Highway 101 which Caltrans identified as a reason for increased risk of head on impacts from vehicles veering over the center line. Similarly, the legislative alternatives proposed by plaintiffs (such as further exceptions to the restriction of STAA heavies on Highway 101) would not ameliorate these safety concerns.

### C. CALTRANS' CONSIDERATION OF MITIGATION MEASURES WAS ADEQUATE

In an attempt to ding Caltrans for its iterative revisions to the project, plaintiffs argue that the changes made between the 2010 EA, the 2013 revisions, and the 2017 EA/FONSI constitute the "substantial reduction in measures to minimize harm" that would require subsequent concurrence by State Parks. 23 C.F.R. § 774.9(c)(3). However, the changes to Caltrans' project did not rise to the level of a "substantial reduction" in harm mitigation. The

12

notable changes between the 2010 minimization measures and the 2013 minimization measures were elimination of night work restrictions and new details on where Caltrans would use pneumatic excavators (equipment that uses pressurized air to displace soil but leave roots unharmed). Caltrans determined the night work restrictions, originally aimed at protecting the marbled murrelet (a protected species of bird), could be lifted once audio-visual surveys conducted over two years failed to detect the marbled murrelet in the project area (34 AR 960–961, 38 AR 2368–2376).

In the 2013 comments to Caltrans' revisions, State Parks raised concerns about the accuracy of the surveys of protected species in the project area. However, in its response, Caltrans pointed out that it had worked with State Parks employees to administer the survey and provide quality control over the course of the survey. Caltrans also took direction from the United States Fish and Wildlife Service (USFWS) to ensure that its endangered species surveys were adequate (31 AR 273, 34 AR 960–61, 38 AR 2368). Moving forward on the project based on the marbled murrelet studies did not render the decision arbitrary or capricious because Caltrans had done its due diligence on the surveys and reasonably collaborated with State Parks and USFWS.

Plaintiffs raised a separate reason for night work restrictions in its 2013 letter, namely, that the noise from night work would disturb visitors and state park staff residing near the project area (AR 720). In both the 2010 EA and the 2010 Section 4(f) evaluation sent to State Parks, however, Caltrans *did* consider the impact of both noise and light disturbances associated with night work (34 AR 960–61). Because of the higher cost and lower productivity of night work, Caltrans explained in the 2009 programmatic Section 4(f) evaluation that night work would be a last resort if the project fell behind schedule (6 AR 1900). The 2010 EA also included noise mitigation proposals, including time restrictions on noise-generating activities, using noise barriers, and prohibiting idling of noisy engines when not in use (1 AR 120). Because Caltrans incorporated the 2010 EA and 2013 revisions into the 2017 EA/FONSI, our record shows that Caltrans adequately considered the impact of noise and came up with mitigation measures.

Given the noise reduction strategies in the incorporated EA, plaintiffs' only remaining argument around mitigation measures is that new information on where pneumatic excavation could be used (this method would still be used where possible) equated to a substantial reduction in mitigation measures. Such an argument lacks merit, especially in light of Caltrans' other efforts to minimize harm. Mitigation measures introduced in 2013 (which remained in the 2017 version) included the use of hand tools where possible, preservation of larger roots in trees' structural root zone, a five-year program to remove invasive species, monitoring of the project by an arborist, mulching of disturbed areas to prevent erosion, among others (32 AR 302–04). These changes came about in no small part due to Caltrans' consideration of public comments, consultation of experts, and collaboration with the appropriate agencies. These measures sufficed.

### D. CALTRANS CORRECTED INADEQUACIES VIA REVISIONS

Plaintiffs argue that Caltrans' reliance on old data found to be unreliable in *Bair I* renders Caltrans' current EA/FONSI invalid. Later iterations of Caltrans' analysis — including corrections made in light of the opinion in *Bair I* — have overcome these deficiencies enough to satisfy Section 4(f). Much progress has been made, despite remaining concerns: Further revisions based on public comment in 2010 and 2013 provided Caltrans' further opportunities to refine their assessment. The weighing in of other agencies has shaped mitigation measures. New surveys of endangered species and new tree studies have strengthened the assessment over time. Yes, early iterations of these assessments included hiccups. Yes, Caltrans could have done even more assessment at certain points. But early on inadequacies do not forever doom the later revisions and iterations of Caltrans' assessment.

### 3. PLAINTIFFS ABANDONED THE WSRA CLAIM

Plaintiffs have not briefed their Wild and Scenic Rivers Act Claim in their renewed motion for summary judgment. Plaintiffs have abandoned this claim and it is therefore dismissed.

14

### 4. INJUNCTIVE RELIEF

Because each of the remaining claims have failed, plaintiffs have no footing to seek injunctive relief. Further, our court of appeals reversed the undersigned judge's prior order to enjoin the project. No injunctive relief is available.

## CONCLUSION

The district court continues to believe that the NEPA reasons it earlier gave warranted relief but our court of appeals felt otherwise. Plaintiffs' NEPA claims are now foreclosed, their Section 4(f) claim lacks merit, and their WSRA claim has been abandoned. Summary judgment therefore must be **GRANTED** for Caltrans and against plaintiffs. Final judgment will be entered for defendants.

**IT IS SO ORDERED.**

Dated: August 30, 2021

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE